# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, GARY TALBOT,<br><br>          Plaintiff,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),<br><br>          Defendant. | No. 17-cv-1997 (EGS) |

## MEMORANDUM OPINION

Plaintiff Gary Talbot ("Mr. Talbot") brings this action against Defendant National Railroad Passenger Corporation ("Amtrak") for retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(Count I); violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, *et seq.*,[1] (Count II); disability discrimination and hostile work environment in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11, *et seq.*,(Count III); retaliation and hostile work environment in violation of DCHRA, D.C. Code § 2-1402.61, *et seq.*, (Count IV); and retaliation in violation of the National Defense Authorization Act for Fiscal Year 2013 ("2013 NDAA"), 41 U.S.C. § 4712 (Count V). Pending before the

---

[1] Mr. Talbot's Amended Consolidated Complaint does not cite to any specific statutes for Counts II, III, IV, and V. *See generally* Am. Consol. Compl., ECF No. 27.

Court is Amtrak's Partial Motion to Dismiss Counts I, III, and IV. Upon careful consideration of the motion, the opposition, the reply thereto, and the applicable law, the Court **GRANTS IN PART AND DENIES IN PART** Amtrak's Partial Motion to Dismiss, and **DISMISSES** Mr. Talbot's claim for Retaliation in Violation of the False Claims Act (Count I).

I.  **Background**

   A. **Factual Background**

The following facts reflect the allegations in the operative complaint, which the Court assumes are true for the purposes of deciding this motion and construes in Mr. Talbot's favor. *See Brown v. Sessoms*, 774 F.3d 1016, 1020 (D.C. Cir. 2014); *see also Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)("[W]e must treat the complaint's factual allegations as true.").

Mr. Talbot, who has been wheelchair bound since 1980, began working for Amtrak on September 5, 2011, when he became the Program Director for Amtrak's Americans with Disabilities Act ("ADA") Program. Am. Consol. Compl., ECF No. 27 at 1 ¶ 1; *see also id.* at 3 ¶ 6.[2] Mr. Talbot explains that his "first tasks centered on collecting and analyzing data aimed at identifying

_____

[2] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

which stations had been worked on to date, which stations were currently being worked on, which were on the horizon, and what Amtrak's established ADA priorities were." *Id. at* 13 ¶ 53. He also "focused on Amtrak's Engineering Department, which was responsible for managing the ADA program and all associated ADA budgets . . . ." *Id.* at 13 ¶ 55. "Throughout his tenure, Mr. Talbot was a non-voting member of the Amtrak Executive Oversight Committee" ("EOC"), which typically met on a biweekly basis and provided oversight of Amtrak's ADA Program. *Id.* at 3-4 ¶¶ 8-9. Based on his belief that Amtrak was misusing and mis-appropriating federal funds earmarked for ADA projects, Mr. Talbot made several disclosures concerning what he viewed as the mismanagement of ADA resources to various internal and external entities. *Id.* at 8-9 ¶ 33. Some of those disclosures included reporting alleged violations to the U.S. Department of Transportation Senior Advisor for Accessible Transportation, Special Assistant to the President and Associate Director of Public Engagement, Amtrak's Office of Inspector General ("OIG"), Amtrak's Vice President of Government Affairs and Corporate Communications and Chair of the EOC. Amtrak's Deputy Chief Engineer[], Amtrak's Chief Engineer, Amtrak's CEO and President, staff to U.S. Senator Tom Harkin, the National Disability Rights Network ("NDRN"), and the Disability Rights Education and Defense Fund ("DREDF"). *Id.* at 9-10 ¶¶ 35-39, 56, 86. On various

3

occasions, including as early as 2011, Mr. Talbot refused to certify that Amtrak was appropriately spending its ADA funding on ADA projects. *Id.* at 15 ¶ 67; *see also id.* at 27 ¶ 116.

Mr. Talbot alleges that he "faced immense and concerted resistance to his disclosures within Amtrak, and because of his efforts, his superiors . . . demoted him, isolated, disparaged, and harassed him." *Id.* at 10 ¶ 41. In particular, he alleges, among other things, that: (1) in or about September 2011, "[s]everal Amtrak Executives upbraided" him as a result of statements he had made at a meeting with Senator Harken's staff, *id.* at 13 ¶ 56, *id.* at 15 ¶ 59; (2) Amtrak Executives "engaged in heated debates and were dismissive of Mr. Talbot's concerns regarding Amtrak's unsafe, noncompliant, and fraudulent actions," *id.* at 37 ¶ 187; (3) Amtrak Executives exhibited "hostility (which included raised voices, anger, frequent interruptions), confrontational actions, and undue scrutiny toward him," *id.* at 38 ¶ 188; (4) "Amtrak Executives also accused Mr. Talbot of 'sabotaging' them during EOC meetings," *id.* at 38 ¶ 191; and (5) "Amtrak Executives commented many times to Mr. Talbot that he was 'too' close to things and could not be objective" because of his disability," *id.* at 18 ¶ 192.

According to Mr. Talbot, on one occasion after speaking with the Amtrak's OIG, his supervisor confronted him and told him his actions were "very risky" and that he "better be

careful." *Id*. at 16 ¶¶ 71-72. "Nevertheless, from approximately
fall 2011 until fall 2014, over the course of multiple meetings
and numerous lengthy conversations, Mr. Talbot continued to
provide the Amtrak OIG with his research and observations on
Amtrak's ADA spending violations . . . ." *Id*. at 16 ¶ 75.

After notifying the Federal Railroad Administration
("FRA")that he disagreed with the "Narrative" Amtrak had
submitted regarding one of its station's platforms and
submitting two memorandums to Amtrak's Chief Engineer, *id*. at
27-28 ¶¶ 118-21; Mr. Talbot states "Amtrak's retaliation was
swift and relentless. *Id*. at 28 ¶ 122. "On December 30, 2015,
[Mr. Talbot's supervisor] notified Mr. Talbot that he was
issuing [him] a '1' out of '4' on his performance appraisal (the
lowest possible rating) and plac[ing] him on a Performance
Improvement Plan ('PIP')." *Id*.

In August 2016, an Amtrak executive informed Mr. Talbot
that his plans for the ADA program no longer included Mr.
Talbot, and Mr. Talbot alleges that Amtrak "secretly demoted"
him from ADA Program Director to a "Manager IV" after claiming
that the Engineering Department was undergoing a reorganization.
*Id*. at 32 ¶ 142. In December 2016, Mr. Talbot's new supervisor
issued him a "1" on his annual performance appraisal and placed
him on a second PIP. *Id*. at 32 ¶ 148. Thereafter, "[i]n February
2017, Amtrak took away Mr. Talbot's private office and instead

5

relocated him to a cubicle." *Id.* at 33 ¶ 149. On September 14, 2017, Mr. Talbot "submitted his response to the second PIP, and explained his concerns regarding Amtrak's [ADA] violations" and provided a copy to several of Amtrak's executives noting his "efforts to enforce ADA compliance and stop the gross misuse of ADA funds." *Id.* at 33 ¶¶ 153-55.

In September 2017, Mr. Talbot "submitted his Statement of Material Evidence and Information [to] the U.S. Department of Justice" and "filed his Qui Tam Complaint for Violations of the federal False Claims Act and for Unlawful Retaliation Against Relator under seal." *Id.* at 34 ¶ 158. Throughout this time, Mr. Talbot alleges that Amtrak began "pressuring [him] to accept a Voluntary Separation Incentive Package ('VSIP'), under the guise of its reorganization effort." *Id.* at 34 ¶ 159.

In December 2017, Mr. Talbot received a positive performance evaluation but, due to ongoing health issues, he went on FMLA leave which was set to expire in March 2018. *Id.* at 36 ¶¶ 170-72. However, on January 11, 2018, Amtrak informed Mr. Talbot that his employment was terminated. *Id.* at 36 ¶ 173. Mr. Talbot states that he believes he "was the only person who was terminated within Amtrak's ADA Department" and, "[t]o his knowledge, [he] was the only person who made well-known his disability." *Id.* at 36 ¶¶ 177-78.

## B. Procedural History

On September 27, 2017, Mr. Talbot filed his initial complaint, under seal, alleging violations of the FCA and retaliation under the FCA. *See* Compl., ECF No. 1. On September 17, 2018, the Government provided notice that it was declining intervention, *see* Gov't's Notice, ECF No. 5, and the action was ordered unsealed on November 7, 2018. *See* Min. Order of Oct. 23, 2018. Mr. Talbot filed an Amended Complaint on January 3, 2019 alleging retaliation in violation of the FCA, violations of the FMLA, disability discrimination in violation of the DCHRA, and retaliation in violation of the DCHRA. *See* Am. Compl., ECF No. 8. On February 1, 2019, the Government consented to the dismissal of Mr. Talbot's claim of violations of the FCA. *See* Gov't's Consent Notice, ECF No. 13. Amtrak filed a Partial Motion to Dismiss Amended Complaint on February 14, 2019, *see* Mot. to Dismiss Am. Compl., ECF No. 14, and on February 28, 2019, Mr. Talbot filed his Opposition to Partial Motion to Dismiss Amended Complaint, *see* Pl.'s Opp'n to Mot. to Dismiss Am. Compl., ECF No. 16. On March 13, 2019, Amtrak filed its Reply to Opposition to Partial Motion to Dismiss Amended Complaint. *See* Def.'s Reply to Pl's Opp'n to Mot. to Dismiss Am. Compl., ECF No. 19. On March 25, 2019, the Court ordered a related case, Civil Case Number 19-470, also filed by Mr. Talbot, to be consolidated with this case. *See* Min. Order of

Mar. 25, 2019. Amtrak refiled its Motion to Dismiss from the now closed Civil Case Number 19-470 docket onto the docket for current docket on April 4, 2019. *See* Def.'s Mot. to Dismiss, ECF No. 23. On April 18, 2019, Mr. Talbot filed his Opposition to Motion to Dismiss, *see* Pl.'s Opp'n to Mot. to Dismiss, ECF No. 24, and Amtrak filed its Reply to Opposition to Motion to Dismiss on May 2, 2019, *see* Def.'s Reply to Opp'n to Mot. to Dismiss, ECF. No. 26. To consolidate all claims into one complaint, the Court denied Amtrak's February 14, 2019 Partial Motion to Dismiss Amended Complaint and ordered Mr. Talbot to file an amended complaint addressing any deficiencies identified by Amtrak. *See* Min. Order of May 23, 2019.

On June 24, 2019, Mr. Talbot filed the operative Amended Consolidated Compliant, *see* Am. Consol. Compl., ECF No. 27, to which Amtrak filed its Partial Motion to Dismiss Am. Consol. Compl. on July 22, 2019, *see* Def.'s Partial Mot. to Dismiss, ECF No. 30 ("Def.'s Mot."). Mr. Talbot filed his Opposition to Partial Motion to Dismiss Amended Consolidated Compliant on August 19, 2019, *see* Pl.'s Opp'n to Partial Mot. to Dismiss Am. Consol. Compl., ECF No. 32 ("Pl.'s Opp'n"), and Amtrak filed its Reply to Opposition to Partial Motion to Dismiss Amended Consolidated Compliant on September 10, 2019, *see* Reply in Support of its Mot. to Dismiss, ECF No. 35 ("Def.'s Reply").

The motion is ripe and ready for the Court's adjudication.

## II. Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court will dismiss a claim if the complaint fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (citation and internal quotation marks omitted).

A complaint survives a Rule 12(b)(6) motion only if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A complaint alleging facts which are "'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). The "doors of discovery" should not be opened for a "plaintiff

armed with nothing more than conclusions." *Id.* at 679.

## III. Analysis

### A. Mr. Talbot cannot state claim for relief against Amtrak under the False Claims Act.

Amtrak argues that it cannot be sued under the provisions of the FCA because the Amtrak Reform and Accountability Act of 1997 ("ARAA") plainly states that Amtrak "shall not be subject to title 31, "which includes the FCA provisions at issue. Def.'s Mot., ECF No. 30-1 at 6; *see also* 49 U.S.C. § 24301(a)(3). Amtrak also points to mandatory authority articulated in *U.S. ex rel. Totten v. Bombardier Corp.*, where the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") indicated that the exclusion of Amtrak from Title 31 meant that Amtrak was not "subject to" the False Claims Act, *see* 286 F.3d 542, 548 (D.C. Cir. 2002), as well as persuasive authority set forth in *Harasek v. Nat'l R.R. Passenger Corp. ("Amtrak")*, 334 F. Supp. 3d 309, 310 (D.D.C. 2018), where Judge Moss dismissed an Amtrak employee's FCA claims against Amtrak. Mr. Talbot briefly responds that the FCA should be construed broadly since its purpose is to "protect the funds and property of the Government from fraudulent claims." Pl.'s Opp'n, ECF No. 32 at 4.

The ARAA states, in relevant part, that "Amtrak . . . is not a department, agency, or instrumentality of the United States Government, and shall not be subject to title 31." 49

10

U.S.C. § 24301(a)(3). In *Ex. rel. Totten*, the D.C. Circuit held

that the FCA applies to third parties who contract with Amtrak,

and in doing so recognized that it would be the "more intuitive

understanding of the [ARAA] . . . [to] read it as preventing

Amtrak from being directly regulated by the various provisions

in title 31, for example, by being sued under the False Claims

Act." 286 F.3d at 548. Judge Moss recently applied this

reasoning to hold that "the inescapable import of the [D.C.

Circuit's] reasoning [in *Totten*] is that [the ARAA] precludes

Amtrak itself from being 'subject to' the FCA." *Harasek*, 334 F.

Supp. 3d at 313.

   *Harasek* dealt with a claim analogous to the one presented

here. In *Harasek*, the plaintiff, who had worked as an "Inspector

for the Amtrak Police Department," alleged that Amtrak "had

subjected her to a series of adverse employment actions in

retaliation" for reporting her concerns that a third-party

contractor had submitted fraudulent claims to Amtrak for work it

allegedly had not completed. 334 F. Supp. 3d at 310. The

plaintiff sought damages, attorneys' fees, and any other relief

provided by the FCA from Amtrak. *See id.* at 312. The Court

concluded that the plaintiff could not state a claim for relief

under the FCA against Amtrak because "[w]hile the FCA generally

imposes '[l]iability for certain acts' committed by 'any person'

defrauding the federal government, 31 U.S.C. § 3729, the [ARAA]

11

carves out a specific exception for Amtrak." *Id.* at 313. In this

case, Mr. Talbot, similar to the plaintiff in *Harasek*, was an

Amtrak employee who claims to have been subject to retaliation

due to his reporting of alleged fraudulent activity. *See*

*generally* Am. Consol. Compl., ECF No. 27. While he does not

specify the relief he seeks are pursuant to the FCA, he seeks

compensatory and pecuniary damages, attorneys fees and punitive

damages, among other things, from Amtrak. *Id.* at 42. As there

have been no changes to the statute or legal precedent in this

Circuit, and in view of Judge Moss' persuasive opinion, the

Court agrees that Amtrak cannot be sued under the FCA.

Accordingly, the Court **GRANTS** Amtrak's Motion to Dismiss as

to his claim that he was retaliated against in violation of the

FCA (Count I).

> **B. Mr. Talbot has plead plausible claims of discrimination on the basis of a disability, retaliation, and hostile work environment under the DCHRA.**

Next, Amtrak argues that the Mr. Talbot's disability

discrimination and retaliation claims under the DCHRA should be

dismissed "because most of the alleged adverse actions are time

barred, and for those remaining, [Mr. Talbot] has not pled facts

that make it plausible that the actions were based on his

disability." Def.'s Mot., ECF No. 30-1 at 10. Mr. Talbot argues

that he is making two types of claims: (1) a disparate treatment

12

claim based on his January 2018 termination which he asserts was timely filed; and (2) a hostile work environment claim based on his January 2018 termination as well as his allegations concerning his demotion, poor performance reviews, PIPs, and office relocation. *See* Pl.'s Opp'n, ECF No. 32 at 5. In Reply, Amtrak argues that Mr. Talbot conceded that his disparate treatment claim was time barred for acts prior to his termination when he argued "that the allegations concerning events occurring before January 3, 2018 are relevant to his hostile environment claim, not his disparate treatment claim." Def.'s Reply, ECF No. 35 at 4.

### a. Amtrak's alleged actions prior to Mr. Talbot's Termination are Time Barred.

To be actionable under the DCHRA, the plaintiff must file a claim "within one year of the unlawful discriminatory act, or the discovery thereof . . . ." D.C. Code § 2-1403.16(a). Mr. Talbot filed his initial complaint in this action on September 27, 2017 alleging two counts: "Violations of The Federal False Claims Act" (Count I) and "Retaliation Based on Protected Activity" relating to his claim under the FCA (Count II). *See* Compl., ECF No. 1 at 25. According his Amended Consolidated Complaint, Mr. Talbot was terminated on January 25, 2018. *See* Am. Consol. Compl., ECF No. 27 at 36 ¶ 173. Mr. Talbot filed his first Amended Complaint, alleging "Disability Discrimination"

13

and "Retaliation," both in violation of the DCHRA, on January 3, 2019. *See* Am. Compl., ECF No. 8 at 35-36. With the exception of his termination, all of the other discriminatory acts Mr. Talbot alleges would have taken place more than a year before he filed his claim under the DCHRA. As Amtrak points out, *see* Def.'s Reply, ECF No. 35 at 4, Mr. Talbot does not seem to dispute that his termination is the only discriminatory action to take place within the one-year window for DCHRA claims. *See* Pl's Opp'n, ECF No. 32 at 4-5. The Court therefore finds that Mr. Talbot's termination is the only discrete act that falls within the one-year statute of limitations window and timely for the purpose of adjudicating Mr. Talbot's disability discrimination and retaliation claims under DCHRA. *See Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 91 (D.D.C. 2007) (holding that the court would only review those discrete acts that fell within the statutory time limit).

### b. **Mr. Talbot provided sufficient facts to state a claim that he was terminated because of his disability in violation of DCHRA.**

The DCHRA prohibits employers from terminating or otherwise discriminating against any individual on the basis of a disability. *See* D.C. Code § 2-1402.11(a)(1). When evaluating claims of discrimination on the basis of a disability, courts in this Circuit "look[] to decisions construing the [Americans with Disabilities Act ("ADA")] for guidance when applying the DCHRA."

14

*Ball v. George Washington Univ.*, No. 17-CV-507 (DLF), 2019 WL
1453358, at *8 (D.D.C. Mar. 31, 2019) (citing *Hunt v. District
of Columbia*, 66 A.3d 987, 990 (D.C. 2013). To survive a motion
to dismiss, Mr. Talbot must allege "two essential elements:
(i)[he] suffered an adverse employment action (ii) because of
[his] race, color, religion, sex, national origin, age, or
disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C.
Cir. 2008). "To prevail on a motion to dismiss, it is not
necessary to establish a *prima facie* case." *Greer v. Bd. of Trs.
of the Univ. of the D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015)
(citing *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 162 (D.C.
Cir. 2015)). Nonetheless, Mr. Talbot "must allege facts that, if
true, would establish the elements of each claim." *Id.* (internal
quotation marks and citation omitted).

Amtrak argues that Mr. Talbot has alleged no facts from
which to conclude that he was terminated because of his
disability. Def.'s Mot., ECF No. 30-1 at 12. Rather, Mr. Talbot
has alleged that he was terminated "because he disclosed
Amtrak's alleged misuse of federal grant funds earmarked for
bringing facilities and stations into compliance with the ADA."
*Id.* at 13. Mr. Talbot argues that the fact that his allegations
pertain to his efforts to bring Amtrak into compliance with ADA
requirements does not "preclude the conclusion that Amtrak
lacked any other unlawful motive" in dismissing him. Pl.'s

Opp'n, ECF No. 32 at 5. He further argues that he has satisfied

his burden at the motion to dismiss stage because his

allegations "describe[s] Amtrak's culture ranging from outright

antagonism to dismissiveness and apathy towards persons with

disabilities—including towards himself." Pl.'s Opp'n, ECF No. 32

at 6 (citing Am. Consol. Compl., ECF No. 27 at 6 ¶ 25

(describing the creation of the ADA); *id.* at 13 ¶ 55 (describing

Mr. Talbot's responsibilities while working for Amtrak); *id.* at

15 ¶ 64 (noting the Amtrak's rejection of Mr. Talbot's

construction recommendation); *id.* at 15 ¶ 66 (requesting more

information before certifying that Amtrak was compliant with

certain ADA requirements); *id.* at 18 ¶¶ 82-85 (describing issues

surrounding passenger access); *id.* at 19 ¶ 89 (describing issues

surrounding passenger access); *id.* at 36-37 ¶ 179 (noting a

letter written on Mr. Talbot's behalf after his termination).

Giving Mr. Talbot the benefit of all inferences that can be

derived from the alleged facts, *see Kowal v. MCI Comm'cns Corp.*,

16 F.3d 1271, 1276 (D.C. Cir. 1994), the Court is persuaded that

he has sufficiently alleged that he was terminated because of

his disability. Mr. Talbot alleges that he is disabled within

the meaning of the DCHRA and that Amtrak discriminated against

him on the basis of his disability when it removed him from his

job. Am. Consol. Compl., ECF No 27 at 40 ¶¶ 203, 204. In his

Amended Consolidated Complaint, Mr. Talbot describes his efforts

to bring Amtrak into compliance with ADA requirements and
Amtrak's resistance to those efforts during his employment with
Amtrak. *See generally id.* Mr. Talbot also alleges statements
made to him from which the reasonable inference is that Amtrak
sought to terminate him because his disability impaired his
judgment: he alleges that on numerous occasions Amtrak
Executives told him that "he was 'too' close to things and could
not be objective. The 'too' close comments related to Mr. Talbot
having a disability and therefore not being able to be
'reasonable' on the various issues that he raised." *Id.* at 38 ¶
192. Accordingly, Mr. Talbot has sufficiently alleged that he
was terminated because of his disability, given the minimal
burden at this stage of the proceedings. *Jackson v. Dist. Hosp.
Partners*, L.P., No. CV 18-1978 (ABJ), 2019 WL 3502389, at *5
(D.D.C. Aug. 1, 2019) (finding the plaintiff to have stated a
disparate treatment claim based on his allegations that he was
suspended and terminated from his position based on his race,
religion and sex).

> ### c. **Mr. Talbot alleged sufficient facts to state a claim that his termination was in retaliation for participating in a protected activity in violation of the DCHRA.**

In Count IV, Mr. Talbot alleges that: (1) his "complaints
regarding the treatment of disabled persons and Amtrak's
discriminatory acts towards disabled customers are protected

under the DCHRA"; and (2) "Amtrak's creation of a hostile work environment and removal of Mr. Talbot constitute unlawful retaliation for his protected oppositional conduct." Am. Consol. Compl., ECF No 27 at 40 ¶ 207-08. Amtrak argues that this claim fails for three reasons: (1) he "does not allege that he engaged in protected activity"; (2) he not allege "that such protected activity was the reason for his termination"; and (3) he has alleged no "*facts* connecting [his] advocacy on behalf of Amtrak's passengers with disabilities and his termination." Def.'s Mot., ECF No. 30-1 at 18, 20. Mr. Talbot responds that his disclosures were protected activities because "[c]ourts may consider violations of different statutes . . . [and] may conclude that a defendant violated both statutes based on the same facts." Pl.'s Opp'n, ECF No. 32 at 9-10. Amtrak replies that complaints about alleged violations of construction regulations established by the ADA are not covered by the DCHRA. *see* Def.'s Reply, ECF No. 35 at 6-7.

To state a claim for retaliation under the DCHRA, Mr. Talbot must allege "(1) that [he] engaged in a protected activity; (2) that [he] was subjected to an adverse action by [his] employer; and (3) that a causal link existed between the adverse employment action and the protected activity." *Akonji*, 517 F. Supp. 2d at 94 (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006)). "To prevail on a motion to

dismiss, it is not necessary to establish a *prima facie* case."
*Greer*, 113 F. Supp. 3d at 310. Nonetheless, Mr. Talbot "must
allege facts that, if true, would establish the elements of each
claim." *Id.* (internal quotation marks and citation omitted).

### 1. Mr. Talbot sufficiently alleged that he engaged in activity protected by the DCHRA.

"To constitute 'protected activity,' the complaint must
allege an employment practice that is prohibited by the DCHRA."
*Vogel v. D.C. Office of Planning*, 944 A.2d 456, 464 (D.C. 2008).
"To make out a claim for retaliation, the plaintiff need only
prove [he] had a reasonable good faith belief that the practice
[he] opposed was unlawful under the DCHRA, not that it actually
violated the Act." *Howard University v. Green*, 652 A.2d 41, 46
(D.C. 1994). "Although in a retaliation action a plaintiff is
not required to prove that the activity which [he] opposed
constituted an actual violation of the Act, [he] nonetheless
must voice [his] complaint about, or oppose, the allegedly
unlawful activity in order to prevail on [his] claim." *Id.*

Giving Mr. Talbot the benefit of all inferences that can be
derived from the alleged facts, *see Kowal*, 16 F.3d at 1276, the
Court is persuaded that he has sufficiently alleged that he
engaged in activity protected by the DCHRA. The "DCHRA makes it
unlawful 'to [in the District of Columbia] deny, directly or
indirectly, any person the full and equal enjoyment of the

goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations' based on the person's actual or perceived disability." *Equal Rights Center v. Hilton Hotels Corp.*, Civil Action No. 07-1528 (JR), 2009 WL 6067336 at * 8 (D.D.C. Mar. 25, 2009) (citing D.C. Code § 2-1402.31(a)); *see also* 42 U.S.C. 12131(1)(C) (defining Amtrak as a public entity within the meaning of the ADA); 42 U.S.C. 12162(e)(2)(A) (ii)(1) ("All stations in the intercity rail transportation system shall be made readily accessible to and usable by individuals with disabilities," by July 26, 2010.).

Amtrak argues that although Mr. Talbot alleges that he engaged in protected activity when he made "complaints regarding the treatment of disabled persons and Amtrak's discriminatory acts towards disabled customers are protected under the DCHRA," Def.'s Mot., ECF No. 30-1 at 18 (quoting Am. Consol. Compl., ECF No. 27 at 40 ¶ 207, his "complaints were actually about his perception that Amtrak misused funds earmarked for ADA compliance projects, not that Amtrak was discriminating against the disabled," *id.* at 19. But Amtrak's argument is beside the point. Mr. Talbot has alleged that he observed and reported to Amtrak Executives non-ADA compliant facilities at, among other places in Washington D.C.,[3] certain train platforms at Union

---

[3] The Court does not address, and expresses no opinion on, whether Amtrak Headquarters and the Government Affairs Office in

Station. *See* Am. Consol. Compl. at 29 ¶ 124 (alleging that Mr. Talbot rejected Amtrak's plan for a new platform because it was not ADA-compliant); *id.* at 29 ¶ 125 (alleging that Mr. Talbot disclosed this non-compliance to, among others, the EOC); *id.* at 29 ¶ 127 (alleging that he informed numerous Amtrak Executives that the platform plan was illegal); *id.* at 33 ¶¶ 154, 156 (alleging that in his response to his second PIP, he addressed the non-compliance of the Union Station platform). Mr. Talbot has satisfied his minimal burden at this stage: he has a reasonable good faith basis to believe that non-ADA compliant platforms at Union Station are unlawful under the DCHRA and he has alleged numerous instances of complaining to numerous Amtrak Executives about the non-compliance. *See Green*, 652 A.2d at 46.

### 2. Mr. Talbot has sufficiently alleged causation.

Amtrak makes two arguments relating to the causation element. First, Amtrak argues that Mr. Talbot's retaliation claim should be dismissed because he has not alleged who made the decision about terminating his employment nor whether that person knew about his complaints of Amtrak's failure to comply with the ADA. Def.'s Mot., ECF No. 301- at 20. However, at the *prima facie* stage, it is not necessary for the plaintiff to allege that the supervisor who took the adverse employment

---

Washington, D.C. fall within the purview of the DCHRA as the parties have not briefed that issue.

action had knowledge of the plaintiff's complaint. *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (noting that "at the prima facie stage the fact that [the plaintiff] submitted the complaint to the agency is sufficient"); *see also Bartlette v. Hyatt Regency*, 208 F. Supp. 3d 311, 323 (D.D.C. 2016) (noting that defendant's argument that plaintiff's complaint was "deficient because it does not allege that the supervisors involved in the discrimination complaints were the same supervisors who engaged in the retaliatory conduct" failed "because the law does not require such a showing" at the motion to dismiss stage). Accordingly, Amtrak's argument is unavailing.

Amtrak's second causation argument, that Mr. Talbot's Amended Consolidated Complaint contains no "facts connecting [Mr. Talbot's] advocacy on behalf of Amtrak's passengers with disabilities and his termination, Def.'s Mot., ECF No. 30-1 at 20, is equally unavailing. "Temporal proximity is not required to state a retaliation claim, as it 'neither demonstrates causality conclusively, nor eliminates it conclusively.'" *Bartlette*, 208 F. Supp. 3d at 323 (citing *Bryant v. Pepco*, 730 F. Supp. 2d 25, 32 (D.D.C. 2010) (citations and alterations omitted)). Rather, "[i]t is sufficient at this stage of the proceedings for a plaintiff to plead causation 'simply by alleging that the adverse actions were caused by his protected activity.' *Id.* Here, Mr. Talbot alleges that he was removed from

his position in "retaliation for his protected oppositional conduct." Am. Consol. Compl., ECF No. 27 at 40 ¶ 208.

For these reasons, Mr. Talbot has stated a plausible claim for retaliation in violation of the DCHRA. Accordingly, Amtrak's Motion to Dismiss as to this claim (Count IV) is **DENIED**.

### d. Mr. Talbot alleged sufficient facts to state a claim that he was subjected to a hostile work environment in violation of the DCHRA.

Although Mr. Talbot's Amended Consolidated Complaint does not contain a separate count for hostile work environment, in Count III, he alleges that "Amtrak discriminated against [him] on the basis of disability when it subjected him to a hostile work environment that culminated in his removal," Am. Consol. Compl., ECF No. 27 at 40 ¶ 204; and in Count IV, he alleges that "Amtrak's creation of a hostile work environment and removal of [him] constitute unlawful retaliation for his protected oppositional conduct," *id.* at 40 ¶ 208.

To state a hostile work environment claim, Mr. Talbot must allege "that [his] employer subjected [him] to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (internal quotation marks and citations omitted). "Although a plaintiff need not plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must support

23

such a claim." *McKeithan v. Boarman*, 803 F. Supp. 2d 63, 69 (D.D.C. 2011) (internal quotation marks and citation omitted). In determining whether Mr. Talbot has alleged facts to support his claim, the Court must evaluate "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201; *see also Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015)(quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115(2002)("A hostile environment consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'"). Furthermore, "[t]he constituent acts must be 'adequately linked' such that they form 'a coherent hostile environment claim.'" *Baird*, 792 F.3d at 168-69 (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)). Finally, "a hostile work environment can amount to retaliation under Title VII." *Baird,* 662 F.3d at 1250 (quoting *Hussain v. Nicholson,* 435 F.3d 359, 366 (D.C. Cir. 2006)); *see also Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010)(applying Title VII retaliation burden shifting framework to DCHRA retaliation claim).

Amtrak argues that the incidents supporting Mr. Talbot's hostile work environment claim are not sufficiently related because: (1) they "are not all the same type of employment

24

action"; (2) "were not carried out by the same person"; and (3) there are lengthy temporal gaps between the events. Def.'s Mot., ECF No. 30-1 at 16. Amtrak also argues that Mr. Talbot has not alleged that these incidents occurred because of his disability. *Id.* at 17. Mr. Talbot responds that he has "sufficiently alleged—at the motion to dismiss stage—sufficiently related incidents that comprise his hostile work environment claim." Pl.'s Opp'n, ECF No. 32 at 6. Amtrak replies that Mr. Talbot's has not plead a sufficient claim of hostile work environment and notes that Mr. Talbot was employed by Amtrak for seven years and "only describe[s] with any specificity six events over the course of three years that he considers to have been hostile acts . . . ." Def.'s Reply, ECF No. 35 at 5.

In support of his hostile work environment claim, Mr. Talbot alleges the following: (1) he "faced immense and concerted resistance to his disclosures within Amtrak, and because of his efforts, his superiors . . . demoted him, isolated, disparaged, and harassed him," Am. Consol. Compl., ECF No. 27 at 10 ¶ 41; (2) in or about September 2011, "[s]everal Amtrak Executives upbraided" him as a result of statements he had made at a meeting with Senator Harken's staff, *id.* at 13 ¶ 56, *id.* at 15 ¶ 59; (3) Amtrak Executives "engaged in heated debates and were dismissive of Mr. Talbot's concerns regarding Amtrak's unsafe, noncompliant, and fraudulent actions, *id.* at 37

¶ 187; (4) Amtrak Executives exhibited "hostility (which included raised voices, anger, frequent interruptions), confrontational actions, and undue scrutiny toward him," *id.* at 38 ¶ 188; (5) "many acts of hostility occurred during various EOC meetings in Washington, D.C., or during other meetings with Amtrak executives in Washington, D.C.," *id.* at 38 ¶ 189; (6) a supervisor "called Mr. Talbot into his Washington, D.C. office alone and belittled him for approximately 20 minutes," *id.* at 38 ¶ 190; (7) "Amtrak Executives also accused Mr. Talbot of 'sabotaging' them during EOC meetings," *id.* at 38 ¶ 191; (8) "Amtrak Executives commented many times to Mr. Talbot that he was 'too' close to things and could not be objective" because of his disability," *id.* at 18 ¶ 192; (9) he was subjected to unnecessary scrutiny and allegations of conflict of interest, *id.* at 30-31 ¶¶ 133-19; and (10) he was subjected to the following adverse actions: (i) demotion, *id.* at 31-32 ¶¶ 142-146; (ii) negative performance reviews and PIPs, *id.* at 28 ¶ 122, *id.* at 32 ¶ 148; (iii) relocation from office to cubicle, *id.* at 33 ¶ 149; and (iv) termination, *id.* at 33 ¶ 151. Mr. Talbot argues that these incidents are not isolated because the EOC meetings occurred on a biweekly basis, that he has identified the bad actors by name in his complaint, and that they "reflect a concerted effort to discredit, intimidate, frustrate, control, and exclude him." Pl.'s Opp'n, ECF No. 32 at

9.

Giving Mr. Talbot the benefit of all inferences that can be derived from the alleged facts, *see Kowal*, 16 F.3d at 1276, the Court is persuaded that he has sufficiently alleged that he was subjected to a hostile work environment. Contrary to Amtrak's argument that he has alleged only five discrete acts over a period of more than four years, Mr. Talbot has alleged, among other things, that throughout his employment with Amtrak, he was treated with hostility; he was isolated, disparaged, and harassed; he was subjected to confrontational actions and undue scrutiny; and his concerns were dismissed. While Mr. Talbot has not provided detailed facts supporting all of these allegations, he has identified specific incidents which he alleges constitute a hostile work environment. And contrary to Amtrak's argument that the acts are not sufficiently related, they do "form a coherent hostile environment claim" because they allege acts consistent with creation of a retaliatory hostile work environment in response to Mr. Talbot's protected activity as well as a hostile work environment based on Mr. Talbot's disability. Mr. Talbot has alleged that he was subjected to these actions both because of his disability and in retaliation for protected conduct pursuant to the DCHRA. At this juncture, the Court cannot conclude that Mr. Talbot's hostile work environment claims should be dismissed, but it is his burden to

put forward evidence in support of his claims as the case moves forward. *See Hutchinson v. Holder*, 668 F. Supp 2d. 201, 219 (D.D.C. 2009) (denying motion to dismiss hostile work environment claim where plaintiff alleges she was "humiliated, falsely accused, and denigrated over a three-year period" and where her "complaint lists dozens of incidents that she alleges constituted a hostile working environment"); *Bartlette*, 208 F. Supp. 3d at 326-27 (declining to dismiss plaintiff's hostile work environment claim even though he "faces an uphill battle" based on his allegations of sexual harassment, constant denial of breaks, and constant unwarranted disciplinary action).

Accordingly, the Court **DENIES** Amtrak's Motion to Dismiss as to Mr. Talbot's hostile work environment claims in Counts III and IV of his Amended Consolidated Complaint.

**IV.   Conclusion**

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Amtrak's Partial Motion to Dismiss and **DISMISSES** Mr. Talbot's claim for Retaliation in Violation of the False Claims Act (Count I). Mr. Talbot may proceed on his remaining claims in Counts II through V. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:      Emmet G. Sullivan**
            **United States District Judge**
            **March 11, 2020**